**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LEJEUNE, G. INDIVIDUALLY AND ON BEHALF OF T.T.,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| | **NO. 17-4965** |
| **KHEPERA CHARTER SCHOOL, PEDRO RIVERA AND THE COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF EDUCATION,** | |
| **Defendants.** | |
| **JOAN P.B., INDIVIDUALLY AND ON BEHALF OF M.F.,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| | **NO. 18-885** |
| **KHEPERA CHARTER SCHOOL, PEDRO RIVERA IN HIS OFFICIAL CAPACITY AS SECRETARY OF EDUCATION FOR THE COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF EDUCATION, AND COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF EDUCATION,** | |
| **Defendants.** | |
| **JEREMIAH G. INDIVIDUALLY AND ON BEHALF OF Z.B.,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| | **NO. 18-886** |
| **KHEPERA CHARTER SCHOOL, PEDRO RIVERA IN HIS OFFICIAL CAPACITY AS SECRETARY OF EDCUATION FOR THE COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF EDUCATION AND THE COMMONWEALTH OF** | |

**PENNSYLVANIA DEPARTMENT OF
EDUCATION,**
               **Defendants.**

## OPINION

The central questions in these matters, which are brought under the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, all concern which entity and in

what manner IDEA obligations are fulfilled after a charter school experiences financial

difficulties.  Plaintiffs are three minor children and their parents who entered into agreements

with Khepera Charter School ("Khepera") to resolve claims that Khepera did not provide them

with an Free and Appropriate Public Education ("FAPE").  Khepera has since breached those

agreements.  Each Plaintiff seeks summary judgment against Khepera and the Pennsylvania

Department of Education ("PDE").  In addition, PDE seeks summary judgment against each of

the Plaintiffs.[1]

### I.       Statutory Framework

In order to put the facts of these cases in context, a brief overview of the statutory

framework is necessary.  The IDEA guarantees students with disabilities a FAPE.  *See* 20 U.S.C.

§ 1412(a)(1).[2]  A FAPE requires access to services "designed to meet [the child's] unique needs

and prepare them for employment and independent living."  20 U.S.C. § 1400(d)(1)(A).  FAPE is

defined as special education and related services that: "(A) have been provided at public expense

. . . ; (B) meet the standards of the State educational agency; (C) include an appropriate

---

[1] This opinion addresses pending motions in three cases: *Lejeune, G. v. Khepera Charter School, et al.*, No. 17-cv-4965 (E.D. Pa),  *Joan P.B. v. Khepera Charter School, et al.*, No. 18-cv-885 (E.D. Pa.), and *Jeremiah G v. Khepera Charter School, et al.*, No. 18-cv-886 (E.D. Pa.).  Although the individual cases are not consolidated, they share common fact patterns and present the same, or overlapping, issues.  In order to "secure the just, speedy, and inexpensive" administration of justice, the Court addresses them together.  Fed. R. Civ. P. 1.

[2] The IDEA was enacted pursuant to Congress's Spending Clause powers.  As a result, the IDEA conditions certain federal funding upon the state's adopting and implementing plans to provide a FAPE to all eligible children.  *See* 20 U.S.C. §§ 1412, 1413.

preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program. . . ." 20 U.S.C. § 1401(9). The central mechanism for providing a FAPE is the "Individualized Education Program" ("IEP"). 20 U.S.C. §§ 1412(a)(4), 1414(d). "The IEP is a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals." *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1043 (10th Cir. 1993).

The IDEA divides responsibilities for ensuring access to FAPE between State Educational Agencies ("SEAs") and Local Educational Agencies ("LEAs"). *See* 20 U.S.C. § 1413. The SEA is responsible for general supervision of the implementation of the IDEA in the state, *see id.* § 1412(a)(11), while the LEA is responsible for directly providing educational programming. *See* 20 U.S.C. § 1414; *see also Gasby by Gasby v. Grasmick,* 109 F.3d 940, 953 (4th Cir. 1997) ("[T]he LEA is responsible for directly providing the services to disabled children" under the IDEA). Congress provides funds to each state that submits a plan with policies and procedures that ensure eligible students receive a FAPE. In turn, the state makes those funds available to LEAs that comply with the SEA's plans under the IDEA. *See* 20 U.S.C. § 1413. When an LEA is "unable to establish and maintain programs of free appropriate public education that meet the requirements of [the IDEA]," the SEA must "provide special education and related services directly to children with disabilities." 20 U.S.C. § 1413(g).[3]

The IDEA also provides procedural mechanisms to solve inevitable disputes that arise

<hr>

[3] Under regulations implemented by the United States Department of Education in accordance with the provisions of the IDEA, a charter school qualifies as an LEA. *See* 34 C.F.R. § 300.7; *see also* 22 Pa. Code § 711.3 (requiring Pennsylvania charter schools to "ensure that a FAPE is available to a child with disability in compliance with IDEA and its implementing regulations.").

among SEAs, LEAs, and parents. States must adopt procedures affording "[a]n opportunity for any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. §§ 1415(a), (b)(6)(A). A parent can challenge the education or IEP provided by the LEA in which their child is enrolled, by filing a complaint and challenging the IEP through a due process hearing before an impartial hearing officer. *See* 20 U.S.C. §§ 1415(f)(1)(A), 1415(g). In Pennsylvania, the Commonwealth's Office of Dispute Resolution ("ODR") is responsible for conducting IDEA due process hearings. *See* 22 Pa. Code § 14.162; *see also Office for Dispute Resolution,* Pa. Special Educ. Dispute Resolution Manual [ODR Manual] § 805 (2017). An aggrieved parent may appeal the hearing officer's decision by bringing a civil action in federal court. *See* 20 U.S.C. § 1415(i)(2)(A).

Despite the appellate procedures, the IDEA encourages parents to resolve disputes without resort to contested hearings. For example, the IDEA provides for mandatory early resolution sessions and optional mediation sessions. *See* 20 U.S.C. §§ 1415(f)(1)(B),(e). "In the case that a resolution is reached to resolve the complaint [in the early resolution session] the parties shall execute a legally binding agreement that is . . . enforceable in . . . a district court of the United States." *Id.* § 1415(e)(F)(iii). Parents are free to enter settlement agreements outside the context of the mediation or resolution sessions. However, unlike settlement agreements reached through resolution or mediation, the IDEA does not provide district courts with subject matter jurisdiction to hear suits to directly enforce private contracts entered into outside the statutory framework provided by the IDEA.


II.     FACTS

4

With this structure in mind, the Court turns to the specific facts of these three cases:

**A. Facts Specific to T.T.**

T.T. was enrolled at Khepera from 2008 until the 2014-2015 school year. T.T. has been identified as a student with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and a Specific Learning Disability. As a result of these disabilities, T.T. is eligible for and in need of special education and related services pursuant to the IDEA.

On November 21, 2014, Plaintiff, T.T.'s guardian, filed a due process complaint against Khepera alleging that the school denied T.T. a FAPE. On March 21, 2015, the due process hearing officer who presided over that Complaint ordered Khepera to provide compensatory education to T.T. Three months after the hearing officer's decision, Khepera and Plaintiff entered into an agreement implementing the hearing officer's order ("T.T. Implementation Agreement"). The parties did not reach the T.T. Implementation Agreement in the context of a statutory mediation or resolution session, and could not have done so given that the IDEA provides that mediation and resolutions sessions occur prior to a due process hearing. *See* 20 U.S.C. § 1415(e). It included a schedule for periodic payments toward a $160,000 special needs trust. The T.T. Implementation Agreement further provided that in the event that Khepera breached the agreement, Khepera would be responsible for Plaintiff's reasonable attorney's fees.

On August 25, 2015, Plaintiff filed a second due process complaint against Khepera seeking additional compensatory education funds as well as tuition payments for T.T. to attend the Y.A.L.E. School ("YALE"), a private school for students with disabilities. On October 12, 2015, Khepera entered into a Resolution Agreement to resolve the educational claims between the parties raised in the August 25, 2015 complaint ("T.T. Resolution Agreement."). The agreement states that is was "reached pursuant to the resolution process under 20 U.S.C. §

1415(f)(1)(B). Pursuant to the T.T. Resolution Agreement, Khepera agreed to pay: (1) an additional $9,240 into a third-party education trust established for T.T.; (2) YALE tuition payments for the 2015-2016 school year; (3) $10,560.96 as reimbursement for tuition to the education trust that had already been paid to YALE; and (4) Plaintiff's attorney's fees in the amount of $14,000. As relevant here, Khepera has not paid $44,450 of the $160,000 due to T.T.'s trust under the T.T. Implementation Agreement. Khepera has also failed to pay YALE's tuition payments for the 2015-2016 school year under the T.T. Resolution Agreement.

## B. Facts Specific to M.F.

M.F. was enrolled at Khepera from the beginning of the 2008-2009 school year through February 2016. M.F. is currently enrolled at the School District of Philadelphia. As a result of M.F.'s Attention Deficit Hyperactivity Disorder, M.F. is eligible for and in need of special education and related services pursuant to the IDEA.

On or about October 25, 2016, M.F. filed a due process complaint against Khepera alleging that Khepera denied M.F. FAPE. On or about January 11, 2017, prior to any due process hearing, M.F.'s guardian and Khepera entered into a settlement agreement (hereinafter "M.F. Agreement") to resolve M.F.'s complaint. The M.F. Agreement was reached in the context of a resolution session as provided for under the IDEA. *See* 20 U.S.C. § 1415(f)(1)(B). The Agreement states that the parties "agree that this Agreement is a Written Agreement reached pursuant to the Resolution Process under 20 U.S.C. § 1415(f)(1)(B). . . ." Under the M.F. Agreement, Khepera agreed to provide $7,514 in compensatory education funds into a special needs trust by January 31, 2017, and pay Plaintiff's attorney's fees in the amount of $8,500. The M.F. Agreement also provided that Khepera would be responsible for Plaintiff's reasonable attorney's fees and costs incurred in enforcing the Agreement. Khepera has not funded M.F.'s

special needs trust or paid M.F.'s attorney's fees.

### C. Facts Specific to Z.B.

Z.B. was enrolled at Khepera during the 2014-2015 and 2015-2016 school years. Z.B. is currently enrolled at Eastern University Academy Charter School in Philadelphia. Z.B. has been identified as a student with Emotional Disturbance, Other Health Impairment, and Specific Learning Disabilities. By reason of these disabilities, Z.B. is eligible for and in need of special education and related services pursuant to the IDEA.

On or about June 16, 2016, Jeremiah G, Z.B.'s guardian, filed a due process complaint against Khepera alleging that the school failed to provide Z.B. with a FAPE. On or about November 1, 2016, Z.B.'s guardian and Khepera reached an agreement to settle their disputes regarding Z.B.'s education. The Z.B. Agreement was reached in the context of a resolution session as provided for under the IDEA. *See* 20 U.S.C. § 1415(f)(1)(B). The Agreement states that the parties "agree that this Agreement is a Written Agreement reached pursuant to the Resolution Process under 20 U.S.C. § 1415(f)(1)(B). . . ." Under the Z.B. Agreement, Khepera agreed to provide $11,124 of compensatory education funds into a special needs trust and pay Jeremiah G.'s attorney's fees in the amount of $23,000. The Z.B. Agreement further provided that in the event that Khepera breached the Agreement, Khepera would be responsible for Jeremiah G.'s reasonable attorney's fees and costs incurred in enforcing the Agreement. On or around November 1, 2016, Khepera issued a check in the amount of $11,124 to a third-party education trust for Z.B. To date, Khepera has paid $13,250 to Jeremiah G in satisfaction of Khepera's obligation to provide attorney's fees. Therefore, Z.B. seeks the balance of $9,750 in attorney's fees due under the Z.B. Resolution Agreement.

### D. Facts Applicable to all Plaintiffs

Khepera operates a charter school pursuant to a charter authorized by the School District of Philadelphia. Its current charter term expires on June 30, 2019. The School Reform Commission (SRC) of the School District of Philadelphia voted to revoke Khepera's charter at the end of the 2017-2018 school year, however Khepera filed a petition to appeal the revocation. During the appeal process, Khepera's charter remains in effect. *See* 24 P.S. § 17-1729-A(f).

As of March 31, 2018, Khepera was open and operating with 395 students enrolled. It's fate in the 2018-2019 school year is, however, uncertain. As of the date of briefing, it had not offered employment contracts to teachers or administrators for 2018-2019, nor had it made final offers of enrollment to any students for that year. Khepera received federal financial assistance through the 2016-2017 school year, however federal funds for the 2017-2018 school year have not been paid. Specifically, the IDEA funds due to Khepera for the 2017-2018 school year were not provided directly to Khepera, but were reallocated, with Khepera's approval, towards satisfaction of the compensatory education PDE has made available to certain special education students pursuant to its fact finding investigations.

Khepera is also experiencing financial difficulties. As of April 18, 2018, it owed approximately $1,400,000 to creditors, $250,000 in outstanding payroll obligations, and $200,000 in outstanding legal liability related to IDEA claims. It had approximately $15,000 in cash-on-hand and the fair market value of its physical assets was less than $50,000. It has also stopped paying some of its debts in the ordinary course of business. It has laid off employees due to financial difficulties and closed its doors on several occasions in 2017 due to financial difficulties. With respect to this case, it has not paid $44,445 in compensatory education under T.T.'s Implementation Agreement, $44,519.08 in tuition payments to YALE under the T.T. Resolution Agreement, $7,514 in compensatory education under the M.F. Agreement, $8,500 in

attorney's fees under the M.F. Agreement, and $9,750 in attorney's fees under the Z.B. Agreement.

On June 14, 2017, Plaintiffs' attorney contacted PDE explaining that Khepera had not complied with its obligations under the T.T. Implementation Agreement, the T.T. Resolution Agreement, the M.F. Agreement, or the Z.B. Agreement. PDE informed Plaintiffs' attorney that since "Khepera is not closed, [Plaintiffs] should enforce the agreements against Khepera. Should Khepera close, however, PDE would ensure that the students receive outstanding educational services owed pursuant to the agreements in accord with 1413(g)."[4] Pursuant to its general supervisory authority under the IDEA, PDE, through the Bureau of Special Education ("BSE") completed a fact-finding investigation concerning compliance by Khepera with its responsibilities under the IDEA and state law for T.T, M.F., and Z.B.. On March 8, 2018, BSE mailed its fact-finding report to each Plaintiff, which made $44,445.00 in compensatory education available for T.T.'s benefit and $7,514.00 available for M.F.'s benefit. Both T.T.'s funds and M.F.'s funds are to be administered through the Pennsylvania Training and Technical Assistance Network ("PaTTAN"). BSE did not investigate or address the tuition owed to YALE, M.F.'s attorney's fees, or Z.B.'s attorney's fees.

## III. LEGAL ANALYSIS

### A. Legal Standard

Summary judgment will be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine dispute exists "when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."

---

[4] As set forth in further detail below, Section 1413(g) discusses when the SEA must step in and provide direct services on behalf of an LEA. *See* 20 U.S.C. § 1413(g).

*Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007). In ruling on a motion for summary judgment, "[t]he reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). Notably, in instances where the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32 (1986).

### B. Plaintiffs' Motions for Summary Judgment Against Khepera

The respective Complaints assert breaches of contract claims against Khepera for failing to pay its obligations under the various agreements. Those claims are: (1) failure to pay $44,450 in compensatory education under the T.T. Implementation Agreement;[5] (2) failure to pay YALE's tuition under T.T. Resolution Agreement; (3) failure to pay compensatory education under M.F. Agreement; (4) failure to pay attorney's fees under the M.F. Agreement; and (5) and failure to pay attorney's fees under the Z.B. Agreement. Each alleged breach is addressed in turn but first, the Court pauses to consider its subject matter jurisdiction over the present action.

### 1. Subject Matter Jurisdiction

Generally, "enforcement of [a] settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 382 (1994). The IDEA provides that subject matter jurisdiction exists to enforce a settlement agreement between eligible parents and an LEA if the agreement was reached through

---

[5] In the alternative, T.T. asserts this claim as a failure to abide by the hearing officer's decision underlying the Implementation Agreement.

an IDEA endorsed mediation or resolution process.  *See* 20 U.S.C. § 1415(e)(2)(F)(iii); *see also id.* § 1415(f)(1)(B)(iii).  The T.T. Resolution Agreement, Z.B. Agreement, and M.F. Agreements were reached in either resolution sessions or mediation sessions and therefore the Court has subject matter jurisdiction over a breach of those agreements.  However, the T.T. Implementation Agreement was not reached during a mediation or resolution session.  Therefore, the IDEA does not confer subject matter jurisdiction over a claim for a breach of the T.T. Implementation Agreement.  *See L.M. v. Lower Merion Sch. Dist.*, 2011 WL 71442, at *3 (E.D. Pa. 2011) (holding that a "settlement agreement related to an IDEA claim which is reached outside the formal mediation or resolution process is not enforceable under the IDEA" in federal court).

But T.T.'s Complaint, read broadly, also asserts a claim for a breach of the hearing officer's decision underlying the Implementation Agreement.  Under 20 U.S.C. § 1415(i)(2), a party "aggrieved by the findings and decision made [by a hearing officer] shall have the right to bring a civil action with respect to the complaint presented pursuant to this section . . . in a district court of the United States."  20 U.S.C. § 1415(i)(2).  The Third Circuit has definitively interpreted this provision to confer jurisdiction where, as here, an LEA refuses to comply with a hearing officer's decision and neither party appealed.  *See D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 278 (3d Cir. 2014) (holding that "individuals seeking to enforce a favorable [hearing officer] decision obtained at the administrative level are 'aggrieved' for purposes of the IDEA and may properly pursue such claims in [federal] court.").

In *D.E.*, the Third Circuit relied heavily on a First Circuit opinion in which that court held that "Congress could not have intended to leave plaintiffs without an IDEA statutory remedy when they succeed before the hearing officer and the school system does not appeal the

administrative decision but simply fails to fulfill a continuing obligation to provide services." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 116 (1st Cir. 2003). However, the statute was amended between 2003 when the First Circuit decided *Nieves-Marquez,* and 2014 when the Third Circuit decided *D.E.*, to provide that a "party bringing [an] action shall have 90 days from the date of the decision of the hearing officer to bring such action, or, if the State has an explicit time limitation for bringing such action under this subchapter, in such time as the State law allows." 20 U.S.C. § 1415 (i)(2)(B).[6] Even though the 90-day limitation was in effect at the time *D.E.* was decided and even though the plaintiff in *D.E.* brought the federal claim after that time had expired, neither the Third Circuit nor any of the briefing before the Third Circuit discussed the applicability of the 90-day limitation. Neither did *D.E.* contain any discussion about whether the limitations period constitutes a jurisdictional hurdle. The question is à propos, particularly given at least one appeals court has suggested that it could be.

In *B.D. v. D.C.* the District of Columbia Circuit Court of Appeals held that the 90-day limitation indicates that the IDEA does not provide a "cause of action for parents seeking to enforce a favorable hearing officer decision" beyond the 90-day limitations period. *See B.D. v. D.C.*, 817 F.3d 792, 801 (D.C. Cir. 2016). The court, in *B.D.*, however, did not consider the second clause of the 90-day limitation period provision. Although the IDEA provides a 90-day deadline to challenge a hearing officer decision, the second clause in the provision suggests that the limitations period is not jurisdictional. Specifically, the IDEA provides that the State law limitations period could operate as an alternative to the 90-day rule. *See* 20 U.S.C. § 1415(i)(2)(B). A limitations period created by state law cannot be jurisdictional because "[o]nly Congress may determine a lower federal court's subject matter jurisdiction." *Bowles v. Russell*, 551 U.S. 205, 217 (2007); *see also Wall Twp. Bd. of Educ. v. C.M.,* 534 F. Supp.2d 487, 493

---

[6] The statute was amended in 2004 by Pub. L. 108-446, 118 Stat. 2715 (2004).

(D.N.J. 2008) (finding that the 90-day rule is not jurisdictional because the statute does not use the term "jurisdiction," among other reasons).  Therefore, the 90-day rule does not implicate the Court's subject-matter jurisdiction and it is subject to waiver.  *See e.g. Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385-398 (1982) (holding that statutory time limit for filing charges was 'not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.").

In this case, Defendants have waived the opportunity to raise the statute of limitations defense.  This Court Ordered T.T. to show cause why jurisdiction exists in light of Section 1415's limitation provision.  T.T. responded that the Court had jurisdiction to enforce the hearing officer's decision pursuant to the Third Circuit's decision in *D.E.*  The Court's Order to Show Cause gave Defendants an opportunity to weigh in on the matter.  They did not.  Nor did they raise the statute of limitations defense in their answer or in their briefing.  Therefore, the defense is waived.  *See Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (holding that an affirmative defense such as statute of limitations is waived unless affirmatively plead in an answer).

Turning to the specifics of the Hearing Officer's decision: he awarded T.T. 2,520 hours of compensatory education valued between $65 and $79, but does not place a precise value on the award.  Instead, according to T.T., the Implementation Agreement "interprets the hearing officer decision as providing $160,000 of compensatory education."  When claims are inextricably intertwined in this manner, the Court may exercise its supplemental jurisdiction to decide both claims in one forum.  A claim to enforce the Hearing Officer's decision necessarily forms "part of the same case or controversy" as a claim to enforce the Implementation Agreement.  28 U.S.C. § 1367(a).  Therefore, this Court has the authority to enforce the T.T.

Implementation Agreement as well.

     2. *Discussion: Breach of Contract Claims Against Khepera*

    Pennsylvania contract law principles apply to the present dispute.  *See J.K. v. Council Rock Sch. Dist.*, 833 F. Supp.2d 436, 452 (E.D. Pa. 2011) (applying state contract law to a violation of a settlement agreement under the IDEA).  Under Pennsylvania law, a party asserting a breach of contract action must establish "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages."  *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010).  With respect to each agreement, the parties have stipulated as to the existence of the agreements and Khepera's breach.  The only dispute is as to damages because Khepera argues that PDE's solutions to provide relief to the Plaintiffs moot their claims.

     a. T.T. Implementation Agreement

    In order to satisfy T.T.'s claim, PDE provided $44,450 in compensatory education, administered through its Pennsylvania Training and Technical Assostance Network ("PaTTAN").  PaTTAN is responsible for the oversight of compensatory education funds when special education students receive compensatory education awards for their LEAs failures to provide a FAPE.  PDE did not pay T.T.'s past-due YALE tuition.

    PDE's solution not moot T.T.'s claims against Khepera for two reasons.  First, T.T. has rejected PDE's solution.  Second, the solution does not provide complete relief to T.T.  Under the T.T. Implementation Agreement, Plaintiff is entitled to compensatory education funds that can be used for services ranging from recreational activities to post-secondary education.  *See J.X. 9* at ¶ 7 (providing that funds should be available for "summer programming of an educational nature . . . tuition for post-secondary education . . . attorney's fees and costs . . . [and]

recreational activities, including but not limited to, basketball camps.").  However, PDE's solution does not permit Plaintiff to use compensatory education funds in that manner.  PDE's letter detailing its solution specifically states that "tuition for post-secondary education, recreational activities . . . [and] attorney's fees" are "ineligible for reimbursement or direct payment." J.X. 17 at 1.  Plaintiffs have also submitted an uncontroverted affidavit stating that they "object to having to share T.T.'s private educational records, including private psychological evaluations with PDE, in order to be reimbursed for such services" as is required by PDE's solution.  Last, PDE has made funds available through PaTTAN, whereas the Implementation Agreement requires Khepera to make those funds available to Plaintiff's trust.  As PDE's solution does not provide complete relief, T.T has suffered damages as a result of the breach of the Implementation Agreement.  Therefore, summary judgment will be granted against Khepera for T.T's claim for an additional $44,445 under the Implementation Agreement.

### b.  M.F. Agreement (Compensatory Education)

M.F.'s claim for $7,514 in compensatory education is also not moot as to Khepera.  The M.F. Agreement requires Khepera to provide $7,514 to a trust set up for M.F.'s benefit.  That agreement entitles M.F. to use those funds for services ranging from educational software to neuropsychological assessments.  PDE's solution, to make $7,514 in funds available through PaTTAN, does not permit such uses.  Therefore PDE's solution does not alter Khepera's obligation to make those funds available in M.F.'s trust.

### c.  M.F., Z.B., and T.T Resolution Agreements (payments to third parties)

Each of the remaining claims for breaches of the M.F., Z.B., and T.T. Agreements concern Khepera's failure to pay third parties such as YALE or the Plaintiffs' attorney, which PDE has refused to compensate as well.  Khepera argues that the respective Plaintiffs will not be damaged by its failure to pay attorney's fees and tuition because the Plaintiffs will not be liable

for those costs.  Pennsylvania case law is to the contrary.  Applying Pennsylvania law, the Third

Circuit has held that "both a promisee and an intended third party beneficiary may sue to enforce

a contract."  *Sanford Inv. Co., Inc. v. Ahlstrom Mach. Holdings, Inc.*, 198 F.3d 415, 422 (3d Cir.

1999).  And the Restatement (Second) of Contracts, which Pennsylvania has adopted, provides

that a promisor has a duty to a promisee for performance to the third-party beneficiary.

*Restatement (Second) of Contracts* § 305.  An example from the Restatement is illustrative of

this principle:

> In consideration of A's promise to transfer to his brother C A's interest in his
> mother's estate, A's father B promises A to pay a like amount to C. A makes the
> promised transfer, but B dies without performing his promise.  A may maintain a
> suit for specific performance against B's personal representative.

*Id*. at Comment a(1).  In this case, T.T, M.F., and Z.B., through their respective

guardians, settled their FAPE claims in exchange for Khepera's promise to pay their

attorneys' fees and YALE's tuition in their respective agreements.  Just as the promisee

may enforce a right to have the promisor pay a third party in the Restatement's

illustrations, so too may T.T., Z.B. and M.F. enforce their attorney's rights to his fees

from the M.F. and Z.B. Agreements and YALE's tuition under the T.T. Resolution

Agreement.

Therefore, summary judgment will be granted in favor of T.T., M.F., and Z.B. to

enforce their respective resolution agreements against Khepera.[7]  However, the matters

do not end there because Khepera is experiencing financial difficulties and has refused to

pay its obligations under Plaintiffs' agreements.

---

[7] Khepera argues that it is entitled to an offset on attorney's fees for certain amounts that Khepera claims Plaintiffs' attorney obtained in a manner contrary to the explicit terms of the M.F. and Z.B. Agreements.  However, "in order to perfect a right to setoff, 'the party asserting setoff rights must prove the debts between the creditor and the debtor is mutual.  To be mutual, the debts must be in the same right and between the same parties, standing in the same capacity."  *U.S. Bank, Nat'l Ass'n v. Rosenberg*, 581 B.R. 424, 428 (E.D. Pa. 2018), *aff'd*, 2018 WL 3640987 (3d Cir. 2018).  Here, Khepera's claim for an offset would be against Plaintiffs' attorney, but its debt is to the Plaintiffs.  Thus, there is no right to an offset.

**C. Cross-Motions for Summary Judgment as to PDE's Liability**

This refusal presents the more difficult question raised by these cases which is not Khepera's liability for its breaches of the various settlement agreements, but whether PDE is required to step into Khepera's shoes with respect to these agreements.  Plaintiffs seek to have PDE pay damages incurred from Khepera's breaches.  Both PDE and the respective Plaintiffs have cross-moved for summary judgment on the same claims.

*1.   Statutory Text regarding SEA's responsibilities*

There are a limited set of circumstances in which an SEA may be required to take on an LEA's IDEA obligations.  Those circumstances arise from two provisions of the IDEA that determine the scope of the SEA's obligations when an LEA fails to provide a student his or her a FAPE.  First, Section 1412, which relates to state eligibility to receive federal funds, provides that the SEA is responsible for ensuring that the LEA "meet[s] the educational standards of the State educational agency. . . ."  20 U.S.C. § 1412(a)(11)(A)(II) (hereinafter "Supervision Clause").  In relevant part, the IDEA provisions regarding LEA eligibility provide as follows:

> A State educational agency shall use the payments that would otherwise have been available to a local educational agency or to a State agency to provide special education and related services directly to children with disabilities . . . if the State educational agency determines that the local education agency . . .
>
> (B) is **unable** to establish and maintain programs of free appropriate public education that meet the requirements of subsection (a); . . . [or]
>
> (D) has 1 or more children with disabilities who can best be served by a regional or State program or service delivery system designed to meet the needs of such children.

20 U.S.C. § 1413(g)(1)(C) (hereinafter "Direct Services Clause") (emphasis added).  However, the statute also confers significant discretion upon the SEA.  The very next provision explains that the SEA may provide such direct services "in such manner and at such locations . . . as the State educational agency considers appropriate."  *Id.* § 1413(g)(2).

### 2. Legislative History regarding SEA's responsibilities

The Third Circuit has interpreted the Supervision Clause to mean that Congress intended to "centralize . . . the state's primary responsibility to provide a publicly-supported education for all children" with the SEA. *Kruelle v. New Castle Cnty. Sch. Dist.*, 642 F.2d 687, 696 (3d Cir. 1981). In support of this proposition, the Third Circuit cited a Senate Report of the IDEA's predecessor statute, which stated that the SEA should have primary responsibility to provide FAPE. Specifically, the report stated:

> Without this requirement, there is an abdication of responsibility for the education of handicapped children. Presently, in many States, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and type of services delivered. While the committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency.

*Id.* at 696 (quoting S.Rep. No. 168, 94th Cong., 1st Sess. 24 reprinted in (1975) U.S. Code Cong. & Ad. News 1425, 1448). The Third Circuit did not decide whether the SEA would be responsible for remedying past failures to provide FAPE by an LEA, but it affirmed the district judge's decision to place "the burden for coordinating efforts and financial arrangements" for an IDEA plaintiff's education on the SEA. *Id.* at 697.

### 3. Case law interpreting SEA's responsibilities

The Supreme Court has not decided when and under what circumstances an SEA is responsible to provide direct services to a student when an LEA cannot or will not. In *Honig v. Doe*, the Supreme Court split evenly "on the question whether a court may order a State to provide services directly to a disabled child where the local agency has failed to do so." 484 U.S. 305, 329 (1988). Since *Kruelle*, several circuits have joined the Third Circuit in holding that an SEA is ultimately responsible for providing children with a FAPE. *See e.g.*, *Pachl v.*

*Seagren,* 453 F.3d 1064, 1070 (8th Cir. 2006) ("The Fourth Circuit has further indicated that state agencies may be financially responsible for the costs of private placement where the applicable local agency was not providing a free and appropriate education."); *St. Tammany Parish Sch. Bd. v. State of Louisiana,* 142 F.3d 776, 784 (5th Cir. 1998); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 952 (4th Cir. 1997) ("[I]t seems clear than an SEA may be held responsible if it fails to comply with its duty to assure that IDEA's substantive requirements are implemented."); *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1492 (9th Cir. 1986) (holding an SEA responsible "whenever the local agency refuses or wrongfully neglects to provide a handicapped child with a free appropriate education" after "adequate notice" of a "significant" breach.).

Reasoning from these cases, as well as the Supervision and Direct Services Clauses of the IDEA, a consensus has emerged "in this district that the SEA assumes responsibility for a failed charter school's FAPE violations." *R.V. v. Rivera*, 220 F. Supp.3d 588, 593 (E.D. Pa. 2016). First, in *Charlene R.*, the court held that an SEA could be held responsible when an "LEA cannot or will not provide a child with a FAPE." *Charlene R. v. Solomon Charter Sch.*, 63 F. Supp.3d 510, 516 (E.D. Pa. 2014). And then in *R.J. v. Rivera*, the court held an SEA responsible for attorney's fees incurred in litigating a child's claims for denial of FAPE against a defunct LEA. *See R.J. v. Rivera*, 2016 WL 4366987, at *3 (E.D. Pa. 2016). Shortly thereafter, this Court decided that "where the LEA has ceased to exist, a parent may look to the SEA to vindicate their child's right to FAPE." *H.E. v. Palmer*, 220 F. Supp.3d 574, 586 (E.D. Pa. 2016), *rev'd on other grounds H.E. v. Walter D. Palmer Leadership Learning Partners Charter Sch.,* 873 F.3d 406 (3d Cir. 2017); *see also R.V. v. Rivera*, 220 F. Supp.3d 588, 592 (E.D. Pa. 2016) (stating that an SEA must step in when the LEA is "unable or unwilling to provide" a compensatory education to a

child). All of these cases share at least one attribute: the school was closed or defunct when the respective courts held the SEA responsible.

### 4. Is an SEA Responsible for IDEA Obligations of an Open and Operating Charter School?

In this case, it is undisputed that Khepera is not closed or defunct. In fact, the stipulated facts are that it is open and operating, but it is experiencing financial difficulties. Plaintiffs argue that whether Khepera is open or operating is of no moment because even if it is not "unable" to comply with its IDEA obligations, it is "unwilling" to do so. For example, Khepera has not complied with court orders requiring it to fulfill its IDEA obligations for other students and it has agreed to divert its IDEA funds to PDE in order to satisfy its students' claims. *See* ECF No 31 Ex. B & C; Stipulated Facts ¶ 7. PDE responds that "[a]dopting an 'unwilling' standard would allow a charter school to conveniently throw up its hands and push selected IDEA obligations onto the SEA, while the charter school simultaneously remains open and operating."

The "unable or unwilling" language that Plaintiffs ask this Court to adopt was found in earlier versions of the IDEA. However, Congress has since amended the statute in a dramatic way. From 1975 until 1997, the IDEA required an SEA to provide direct services when an LEA was "unable *or unwilling* to establish and maintain programs of free appropriate public education." *See* Education of the Handicapped Act, Pub. L. 94–142, 89 Stat 773 (1975) (emphasis added).[8] On June 4, 1997, Congress amended the IDEA to require the SEA to provide direct services only when the LEA was "unable to establish and maintain programs of free appropriate education." IDEA Act Amendments of 1997, Pub. L 105–17, 111 Stat 37 (1997). The word "unwilling" had been removed from the provision and has not since been added back. *See* 20 U.S.C. 1413(g)(1)(B). In short, Congress actively rewrote the IDEA to eliminate the

---

[8] The Education of All Handicapped Children Act was renamed Individuals with Disabilities Education Act in 1990.

word "unwilling." "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (Court must construe statute to give effect, if possible, to every provision). Viewing the new version of the statutory language in the context of the old version demonstrates that Congress intended that while an SEA must step in to provide direct services to students when an LEA is unable to provide a FAPE, it need not step in simply because an LEA is unwilling to do so.

As Plaintiffs point out, several courts continue to use the "unable or unwilling" standard, but those cases relied on earlier cases interpreting the predecessor statute. For example, in *Charlene R.*, the court relied on the Fourth Circuit's decision in *Gadsby* when it stated that an SEA must step in "where a LEA is either unable or unwilling to establish and maintain programs for the provision of a FAPE." *Charlene R.*, 63 F. Supp.3d at 515-16. However, in *Gadsby*, the Fourth Circuit was interpreting the predecessor statute, prior to the 1997 amendments. *See Gadsby*, 109 F.3d at 943 (quoting 20 U.S.C. § 1414(d)(1)); *see also M.K. by & through Barlowe K. v. Prestige Acad. Charter Sch.*, 302 F. Supp.3d 626, 629 (D. Del. 2018) (also relying on *Gadsby*).

Plaintiffs also rely on Subpart D of the Direct Services clause to support their contention that an SEA must step in for an unwilling LEA. That section provides that an SEA must provide direct services when an LEA "has 1 or more children with disabilities who can best be served by a regional or State program or service delivery system designed to meet the needs of such children." 20 U.S.C. § 1413(g)(1)(D). The text of Subpart D refers to a "State program[s]" or "service delivery system[s] designed to meet the needs of such children." It does not refer to a situation such as the present case where

the Plaintiffs merely ask the SEA to pay money to resolve individual students' prior claims for compensatory education under the IDEA.[9]  Such monetary claims are neither "program[s]" nor "service delivery system[s]" which are more easily provided by the SEA than the LEA.

Thus, the Court concludes that the IDEA does not require an SEA to step in and fulfill IDEA resolution agreements when the LEA is merely "unwilling" to comply.

### 5.  Is Khepera Unable to Satisfy its Obligations under the Agreements?

In light of the above, in order to succeed on its claims against PDE, Plaintiffs must demonstrate that Khepera is unable to satisfy its IDEA obligations under the various agreements related to these cases.

They have done so.  Preliminarily, Khepera has not answered Plaintiffs' complaints.  By not answering, Khepera has admitted the allegations in the complaints, which are that it is unable to comply with its IDEA obligations.  *See* Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless [the defendant] serves on the requesting party a written answer or objection addressed to the matter. . . .").  Further, the IDEA funds allocated to Khepera for the 2017-2018 school year were not provided directly to Khepera, but were reallocated, with Khepera's approval towards satisfaction of the compensatory education PDE has made available to certain students pursuant to its fact-finding investigations.  A letter from PDE to Khepera states that the amount it will

---

[9] In *Chavez v. Board of Educ. of Tularosa Municipal Schs*, the district court relied on the Third Circuit's opinion in *Kruelle* to hold that Subpart D required an SEA to provide direct services whenever the LEA was unwilling or unable to comply with its IDEA obligations.  *See* 614 F. Supp.2d 1184, 1207-08 (D. N.M. 2008).  The court reasoned that "[i]f an LEA refuses to provide services that it is obligated to provide to a child, that child can 'best be served' by the [SEA]."  *Id.* at 1208.  However, that case did not consider the meaning of the terms "program" or "service delivery system."  Neither is *Kruelle* directly applicable to the present case because in that case "all parties concede[d] that [the plaintiff] need[ed] full-time assistance from the state of Delaware beyond that available in any day school program" in that state.  *Kruelle*, 642 F.2d at 692.  Given the plaintiff's specific needs, coupled with the absence of any sufficient program provided by an LEA within the state of Delaware, there was no difficulty in concluding that a *program* run by the state of Delaware could better serve the plaintiff's needs.

have to pay to the IDEA plaintiffs in these matters, and others not before this Court, will exceed the amount of Khepera's IDEA-B grant funds and so "Khepera should not expect to receive any IDEA-B grant funds from its original allocation." And the parties have not identified any other funding source from which it could meet those obligations. The fact that Khepera has no IDEA funding source to pay the Plaintiffs buttresses its admission that it is unable to comply with its obligations to these Plaintiffs. Therefore, the SEA is required to step in to the breach.

   *6. What Are the Boundaries of an SEA's Discretion?*

   The question remains as to the manner in which PDE must step in to provide direct services. The Direct Services clause provides that an SEA "may provide special education and related services . . . in such manner and at such locations . . . as the State educational agency considers appropriate." 20 U.SC. § 1413(g)(2).

   Research does not disclose – and the parties do not cite – a single case interpreting the bounds of an SEA's discretion to provide direct services. The text of the statute suggests that an SEA's discretion in that regard is significant. The statute says that the SEA may provide direct services "in such manner . . . as the State educational agency considers appropriate." 20 U.S.C. § 1413(g)(2). But the IDEA contains a caveat concerning an SEA's discretion. It further states that "[s]uch education and services" – referring to direct services – "shall be provided in accordance with this subchapter." 20 U.S.C. § 1413(g)(2). Thus, the manner in which PDE may provide direct services is constrained insofar as it must comply with the IDEA provisions regarding the provision of a FAPE. The Third Circuit encountered a similar statutory provision in *Republic Steel Corp v. U.S. Dep't of Labor,* 590 F.2d 77 (3d Cir. 1978). In that case, the Federal Coal Mine Health and Safety Act of 1969 provided compensation to coal workers who suffered from black lung disease and also provided that an employer should pay counsel fees to

successful claimants. That statute was amended to define employer "to refer to the trustees of the fund, as the Secretary considers appropriate and as is consistent with the [statute]." *Id.* at 82. The Third Circuit held that the "considers appropriate" language was not an "open-ended delegation of legislative authority to the Secretary of Labor. His discretion is limited by the qualification that its exercise be consistent with the statutory provision." *Id.* In much the same way, PDE's discretion is not unlimited. Its provision of direct services must comply with the IDEA.

a.   T.T. Implementation Agreement

Here, PDE's solution complied with the IDEA with respect to T.T.'s Implementation Agreement. Although the T.T. Implementation Agreement required Khepera to deposit $44,445 to T.T.'s trust, PDE has deposited the same amount into an account for T.T.'s benefit through PaTTAN. T.T. argues that administering the funds through PaTTAN is less desirable because PaTTAN limits the potential uses of the funds and because PaTTAN's reimbursement process is cumbersome. First, PaTTAN, does not permit funds to be used for recreational activities, private placements, and tuition for post-secondary education, all of which are included in the T.T. Implementation Agreement. However, the definition of compensatory education in the IDEA does not include recreational activities, private placements, or tuition for post-secondary education. *See* 20 U.S.C. § 1400(d), 1415(e)(2). Therefore, T.T. will not be denied a FAPE if funds are administered through PaTTAN instead of the trust. Second, Plaintiff asserts that PaTTAN involves a "sluggish and cumbersome compensatory-education reimbursement process." However, such facts are not in the record and even if they were, the IDEA contains no provision addressing the speed in which reimbursement is required. Therefore, since PDE's provision of direct services complies with the IDEA's definition of compensatory education,

PDE was within its discretion to provide direct services through PaTTAN as opposed to T.T.'s trust.[10] In light of the definition of compensatory education in the IDEA, T.T. would have been afforded a FAPE by provision of funds through PaTTAN if T.T. accepted PDE's solution.

Therefore, summary judgment will be entered in favor of T.T.'s claim in a manner consistent with PDE's letter of March 26, 2018 as to T.T.'s claim for enforcement of the Implementation Agreement.

### b. T.T. Resolution Agreement

T.T.'s claim against PDE for reimbursement of YALE's tuition under the Resolution Agreement turns on whether T.T. will be denied a FAPE if PDE does not step in to the breach.

T.T. will not be denied a FAPE if PDE does not reimburse YALE. *See Olivia B. v. Sankofa Acad. Charter Sch.*, 2014 WL 3797282, at *10 (E.D. Pa. 2014) (holding that an SEA's refusal to reimburse past due private school tuition will not deprive a child of a FAPE). T.T.'s Resolution Agreement states that "[n]othing in this Agreement shall constitute an acknowledgement by [Khepera] that placement at The YALE School . . . is necessary to provide [T.T.] with a Free and Appropriate Education. . . ." In addition, the Resolution Agreement obligated T.T.'s guardian to notify Khepera if she "believes that placement and program at the YALE School is no longer appropriate or no longer provides [T.T.] with [a] FAPE." T.T. was not withdrawn, disenrolled, or otherwise removed from YALE as a result of Khepera's nonpayment to YALE. And T.T.'s guardian never objected to YALE's education plan. Therefore, T.T. has not been denied a FAPE because of Khepera's nonpayment.

T.T. argues that IDEA's policy of ensuring access to a FAPE will be undermined if PDE

---

[10] In addition, PDE maintains that its fiduciary obligations for federal funds prevent it from depositing IDEA funds in Plaintiffs' Trusts because Trust funds can be used to pay attorney's fees and Federal regulations interpreting the IDEA prohibit the use of any IDEA funds "to pay attorneys' fees or costs of a party related to any action or proceeding. . . ." 34 C.F.R. § 300.517(b).

does not pay the YALE tuition. Specifically, T.T argues that PDE's position would disadvantage low-income children because only children whose parents could afford tuition would be able to seek the direct payment remedy. Citing these concerns, several courts have held that a direct payment remedy for retroactive tuition may be appropriate in certain situations. *See, e.g. E.M.*, 758 F.3d at 454 (holding that "direct payment" might be appropriate in certain situations, but remanding the case for further proceedings); *Mr. & Mrs. A. ex rel. D.A.*, 769 F. Supp. 2d at 428; *A.R. ex rel. F.P. v. New York City Dep't of Educ.*, 2013 WL 5312537, at *11 (S.D.N.Y. 2013) (holding that the IDEA "includes the power, in a proper case, to award retroactive direct payment of private school tuition."). However, each and every case holding that a school district was required to make retroactive direct payments for reimbursement of private school tuition involved an appeal of a administrative proceeding under Section 1415(i)(2)(C). Unlike here, each of those cases alleged that a student was denied a FAPE. While the policy justifications might weigh in favor of requiring PDE to pay YALE's tuition, the text of the statute does not support such a claim. Therefore, PDE is not liable for that provision under T.T.'s Resolution Agreement.

Summary judgment will be entered in favor of PDE as to T.T.'s Resolution Agreement.

c. M.F. and Z.B. Agreements

M.F. also seeks to enforce the M.F. Agreement between M.F.'s guardian and Khepera against PDE. Specifically, M.F. seeks $7,514 of compensatory education and attorney's fees in the amount of $8,500. PDE has made $7,514 in funds available through PaTTAN. As with T.T.'s Implementation Agreement, PDE would have fulfilled its statutory obligations by depositing the amount that Khepera owes in compensatory education to M.F. in a fund administered by PaTTAN if M.F. accepted the solution. Therefore, summary judgment will be

granted to M.F. as to the claim compensatory education under the M.F. Agreement in a manner consistent with PDE's letter of March 26, 2018.

But that is not the end of the matter. M.F. and Z.B. also ask PDE to pay their attorney fees due under their resolution agreements. Subsection 1415(i)(3)(B)(i) permits a Court to "award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i). More specifically, a court has discretion to award attorneys' fees when a plaintiff prevails against an LEA at a due process hearing. *See* 20 U.S.C. § 1415(i)(3)(B) (providing that a court "*may*" award reasonable attorneys' fees). Neither M.F. nor Z.B. went through a due process hearing: they reached their settlement agreements through a negotiated process. Thus, the attorney's fee provision does not apply.

Plaintiffs seek to enforce a settlement agreement that was reached in a negotiating process between M.F., Z.B., and Khepera in which PDE was not involved. Absent PDE's involvement in the underlying dispute giving rise to the attorney's fees liability, it is not obligated pay them. *See Santino P. v. Pennsylvania Dep't of Education*, 2017 WL 2591936 (E.D. Pa. 2017).[11] "If, as Plaintiff[s] contend[], fee shifting was *integral* to a free appropriate public education, Congress would have mandated it as it has done in countless other federal statutes." *Id*. at *6.

Accordingly, summary judgment will be entered in favor of PDE on M.F. and Z.B.'s claims to enforce their respective resolution agreements regarding attorney's fees.

---

[11] Although PDE is not liable for attorney's fees under Plaintiffs' agreements, the Court reserves any decision whether they may be entitled to attorney's fees in the context of a fee petition as a "prevailing party" in this federal action.

Separate orders follow.

BY THE COURT:


**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**

**August 29, 2018**